IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RONALD H. FREEMAN, | : | Case No. 4:14-CV-01581 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| CAROLYN W. COLVIN, | : | |
| ACTING COMMISSIONER OF | : | |
| SOCIAL SECURITY | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM

June 15, 2015

## I. Introduction

Plaintiff, Ronald H. Freeman ("Freeman") has filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying his claim for social security disability insurance benefits ("DIB").

Disability benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirement of being insured is

commonly referred to as the "date last insured." Freeman met the insured status requirements through at least December 31, 2016. Tr. 17.[1]

Freeman protectively filed his application for DIB on August 7, 2012. Tr. 114-17. Freeman claims that he became disabled on October 26, 2011. Tr. 164. Freeman has been diagnosed with several impairments, including psoriatic arthritis, obstructive sleep apnea, restless leg syndrom, carpel tunnel syndrome, osteoarthritis in his knees, diabetes, depression, obesity, high cholesterol, allergies, and bilateral cataracts. Tr. 18. On November 15, 2012, Freeman's application was initially denied by the Bureau of Disability Determination. Tr. 87.

On February 5, 2013, Freeman requested a hearing before an administrative law judge ("ALJ"). Tr. 97. The ALJ conducted a hearing on February 12, 2014, where Freeman was represented by counsel. Tr. 41-79. On March 24, 2014, the ALJ issued a decision denying Freeman's application. Tr. 12-24. On June 24, 2014, the Appeals Council declined to grant a review. Tr. 1-11. Freeman filed a complaint before this Court on August 12, 2014. Supporting and opposing briefs were submitted and this case became ripe for disposition on April 21, 2015.

Freeman appeals the ALJ's decision on two grounds: (1) the ALJ failed to properly assess all of the relevant facts before making a disability finding, and (2) the

---

[1]References to "Tr._" are to pages of the administrative record filed by the Defendant as part of the Defendant's Answer.

ALJ improperly determined that Freeman had no limitations from his upper extremities or sleep impairments. For the reasons set forth below, the decision of the Commissioner is vacated and remanded for further proceedings.

## II. Statement of Relevant Facts

Freeman is 63 years of age, graduated high school and attended college for one year but did obtain a degree or certification. Tr. 49. He trained as an auto mechanic in 1973, but did not work in that field. *Id*. Freeman has had past relevant work as a customer relations coordinator for a soda company from June 1981 until February 1999, as a human resource manager for a nursing home from March 1999 until January 2011, and briefly as a machine operator in October 2011. Tr. 134, 158, 182-83. Freeman reported that he lived with a friend, that he remained able to visit his stepmother daily, prepared simple meals, did his laundry, mowed the grass on a riding mower, walked his dog three blocks daily, shopped, handled his finances, went to church weekly, and gave sermons. Tr. 48, 63-66, 145-52. Freeman collected unemployment compensation, ("UC") after his alleged disability onset date until the end of June 2012. Tr. 50. Freeman testified that during that time period, he applied for jobs in human resources and retail, went on one interview, but was not offered the position. Tr. 50-51.

## A. Freeman's Physical Impairments

On October 5, 2011, Freeman saw Brian A. Delvecchio, D.O., for osteoarthritis and psoriatic arthritis. Tr. 591. Since his last visit, Freeman was doing well overall from a skin/joint standpoint while on Methotrexate. *Id*. Freeman was seeing an orthopedist for a left knee internal derangement and moderate-to-severe joint space narrowing. *Id*. Freeman had also had a series of Euflexxa injections in his knee but the benefits according to Freeman, were marginal at best. *Id*. He also reported that subsequent intra-articular steroid injections he had received helped to reduce his knee pain. *Id*. Freeman was also taking Tramadol occasionally for the knee pain and this was proving to be "quite effective." *Id*. After conducting a physical and a musculoskeletal examination of which the findings were normal, Dr. Delvecchio continued the Methotrexate treatment for Freeman's psoriatic arthritis. Tr. 592.

Ten months later on August 6, 2012, Freeman followed up with Dr. Delvecchio. Tr. 613-15. Freeman noted some right wrist pain and denied any recent injury or trauma to the area. Tr. 613. On a musculoskeletal examination, Freeman was tender in the right wrist radial area. Tr. 614. Dr. Delvecchio then injected Freeman's right wrist with Depomedrol. *Id*.

On January 3, 2013, x-rays were taken of Freeman's knees. Tr. 939-40. The right knee x-ray showed lateral and patellofemoral compartment degenerative

changes, which showed no significant change from x-rays taken previously in December 2009.  Tr. 940.  The left knee x-ray also showed tricompartmental degenerative changes that were similar to the x-rays taken in December 2009.  Tr. 940.

Freeman next saw Dr. Delvecchio on January 29, 2013. Tr. 1009.  His physical and musculoskeletal examination was normal, with no tender or swollen joints.  Tr. 1011.  There was no evidence of active inflammatory arthritis and Freeman described his pain level as a four out of ten.  Tr. 1011.  An MRI taken of Freeman's right wrist was also examined and showed a number of erosions which were consistent with Freeman's history of psoriatic arthritis.  Tr. 943.  On February 6, 2013, Dr. Delvecchio filled a Department of Public Welfare form on Freeman's behalf.  Tr. 943-44.  He opined that based on objective medical tests and Freeman's medical history, Freeman was temporarily disabled from March 1, 2013 to March 1, 2014. *Id*. Freeman also received a Depomedrol injection and completed a series of Synovisc injections in both knees on February 11, 2013.  Tr. 987, 1005, 1008.

On April 16, 2013, Freeman saw Daniel R. Feldman, M.D. for a two-month follow-up visit.  Tr. 1004.  Freeman reported decreased knee pain after the injections, but complained that his immobility continued.  Tr. 1004.  They discussed the possibility of a total knee replacement "TKR" but  Freeman wanted to try another

round of Synovisc injections before pursuing surgery.  *Id*.

Freeman next saw Dr. Delvecchio on August 1, 2013 for further evaluation of his osteoarthritis and psoriatic arthritis. Tr.  997.  Freeman noted occasional right wrist pain and that his steroid injections were without  much benefit.  *Id*.  Dr. Delvecchio continued with Methotrexate.  Tr. 1000. On August 13 and 21, 2013, Freeman received bilateral knee injections.  Tr. 984-85, 987.

Freeman was evaluated for poor sleep with Ghulam Khaleeq, M.D., on  August 13, 2013.[2]  Tr. 988-93.  Freeman informed Dr. Khaleeq that since "retiring" his sleep had worsened.  Tr. 989.  He reported that he had difficulty falling asleep and when he did fall asleep, it varied from an hour to 16 hours.  *Id*.  He also told Dr. Khaleeq that even though he used a CPAP machine every night, he took it off in the middle of the night.[3] *Id*.

Freeman also reported having restless leg symptoms which interrupted his sleep.  *Id*.  On examination, Dr. Khaleeq assessed moderate obstructive sleep apnea

---

[2]Freeman had a history of moderate sleep apnea. The initial study on January 6, 2010 showed moderate obstructive sleep apnea. Tr. 988.  His CPAP trial on January 17, 2010, showed improvement of symptoms with a pressure of 8cm H2O . Tr. 988-89.

[3] Continuous positive airway pressure therapy ("CPAP") uses a machine to help a person who has obstructive sleep apnea (OSA) breathe more easily during sleep. A CPAP machine increases air pressure in the throat so that the airways do not collapse when breathing in.  American Sleep Association, What is Sleep Apnea, *available at* https://www.sleepassociation.org/patients-general-public/obstructive-sleep-apnea_/. (last visited June 8, 2015).

on CPAP therapy, inadequate sleep hygiene, obesity, diabetes and hypertension.  Tr. 993.  Dr. Khaleeq stressed to Freeman that he should be more compliant with his CPAP therapy.  *Id*.  Furthermore, Dr. Khaleeq remarked that since Freeman's retirement has resulted in an irregular sleep pattern, he was to establish a standard bed and wake up time with no napping in between.  *Id*.  Freeman was also advised to lose weight, avoid driving, operating heavy machinery or engaging in any activity that requires full alertness if feeling sleepy, drowsy or otherwise impaired.  *Id*.

On December 18, 2013, Freeman followed up with Dr. Khaleeq.  Tr. 965.  He reported that he was feeling the same, trying to use the CPAP machine every night but, in fact, only using it for 3-4 hours and not feeling well rested.  *Id.* Freeman also reported that his sleep was interrupted multiple times and his restless leg symptoms had not abated.  *Id.*  Dr. Khaleeq's diagnosis remained unchanged and, again, he stressed compliance with the CPAP machine.  Tr. 968.  Dr. Khaleeq ordered a CPAP retitration study and repeated his advice to Freeman to lose weight, avoid driving, operating heavy machinery or engaging in any activity that requires full alertness if he was feeling sleepy, drowsy or otherwise impaired.  Tr. 968-69.

On January 23, 2014, Freeman participated in a sleep study.  Tr. 1028-39.  The physician recommended that Freeman start on a BiPAP machine, consider a new course of treatment to decrease arousals from sleep and to improve sleep

fragmentation and to lose weight under medical supervision.  Tr. 1028.  He was also advised not to drive or engage in activities that require full attention while feeling drowsy.  *Id.*

## B. Consultative Examination and the State Agency Opinion

On October 30, 2012, Freeman had a consultative physical examination with David Yang Go, M.D.  Tr. 928-38.  Freeman was asked to remove his shirt, socks, and laced-up shoes. Tr. 930.  Dr. Go noted that these fine finger motions were completely normal and he was able to remove his shirt, socks and shoes without any signs of stiffness or pain.  *Id*.  His legs had no edema, there were no deformities of the finger joints and wrists and no inflamation of the joints.  *Id*. His knees were also normal with no swelling or inflammation.  *Id*.  Freeman had a normal range of neck, shoulder, elbow, wrist, hip, back, knee, and ankle motion.  Tr. 930-31.  Freeman had a good and strong thumb to fifth finger opposition and opposition to all fingers.  Tr. 931.  His spinal sensory examination was normal and his straight leg raising examination was negative.  *Id*.

Dr. Go assessed Freeman with psoriatic arthritis which was well controlled with his current course of  medications.  *Id*.  Freeman had no apparent problems in the use of his hands, arms, back neck, hips or legs.  *Id*.  Dr. Go opined that Freeman's

standing, walking, sitting and postural activities were unlimited.  Tr. 931, 933-34.

He put no limitations on Freeman's lifting, carrying, pushing and pulling but noted

that consideration must be given to Freeman's age, as he was then 61years old and

not in very good overall condition. Tr. 931, 933.  Finally, Dr. Go opined that other

physical functions such as reaching and fingering were within normal limits, and gave

no environmental restrictions. Tr. 931. 934.

On November 15, 2012, Leo P. Potera, M.D., a state agency physician,

reviewed Freeman's medical records together with Dr. Go's report and opined that

Freeman remained able to perform light work; his pushing/pulling was limited in his

arms; he could frequently climb ramps/stairs, balance and stoop and occasionally

climb ladders/ropes/scaffolds, kneel crouch and crawl. Tr. 84-85.

## C. Administrative Hearing

On February 12, 2014, Freeman's administrative hearing was conducted.  Tr.

42-79.  Freeman first testified that as a result of his sleep apnea, he was unable to stay

awake during the daytime or to fully concentrate on his work related tasks. Tr. 52-53.

He explained that while at work, he had fallen asleep looking at his computer screen

and during meetings.  Tr. 53.  Freeman also testified that he had to take work home

often so he could complete any unfinished reports from the day's tasks.  Tr. 58.

Freeman also testified that the pain in his wrists affected his ability to perform his duties at work.  Tr. 59.  He could not perform the paperwork and computer work necessary for his position as HR manager.  Tr. 59.  Freeman testified that he could use his hands to perform non-constant typing or writing for about an hour before needing to stop for the day.  Tr. 67.  He also indicated that his hands had lingering problems the following day after using his hands.  Tr. 67-68.  Freeman testified that he had difficult lifting things, repetitive activities made his hands cramp and although he was capable of daily activities such as showering, getting dressed, cooking or shopping, these tasks took longer to complete because of the pain in his wrist.  Tr. 63.

 When asked to describe any limitations with regard to the arthritis in his knee, Freeman testified that he could stand for about 15 to 20 minutes without having to sit, although it was painful to do so.  Tr. 60.  He explained that he could not sit at his desk for prolonged periods of time due to restlessness and pain in his knees.  Tr. 59. Freeman also explained that his tolerance for pain depended on how much effort he had exerted previously. Tr. 60.  For example, if he stood for half an hour and then sat down, he would be unable to stand for the same length of time, the next time around. *Id*.

Freeman testified that the nursing home where he last worked was owned by his ex-wife's family.  Tr. 52.  He testified that he believed that his family connections

allowed him to maintain his job for as long as he did.   Freeman believed that the

management accommodated his sleep apnea allowing him to miss meetings.   Tr. 52-

54.   He continued working at this position for a year after he and his wife divorced;

he was then terminated by his ex-wife's brother.   Tr. 52.

## III. Discussion

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision

denying a plaintiff's claim for disability benefits, the district court must uphold the

findings of the Commissioner so long as those findings are supported by substantial

evidence.   Substantial evidence "does not mean a large or considerable amount of

evidence, but 'rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988),

quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938).   Substantial

evidence has been described as more than a mere scintilla of evidence but less than

a preponderance.   *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).   In an

adequately developed factual record substantial evidence may be "something less than

the weight of the evidence, and the possibility of drawing two inconsistent

conclusions from the evidence does not prevent an administrative agency's finding

from being supported by substantial evidence." *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims. *See* 20 C.F.R. § 404.1520; *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91-92 (3d Cir. 2007). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. *See* 20 C.F.R. § 404.1520.   The initial burden to prove disability and inability to engage in past relevant work rests on the claimant; if the claimant meets this burden, the burden then shifts to the Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason*, 994 F.2d at 1064.

## A.  The ALJ's Residual Functional Capacity Assessment.

Freeman argues that the ALJ did not consider Freeman's carpel tunnel syndrome and failed to include any upper extremity limitations in the residual functional capacity assessment.  As a threshold matter, Freeman testified that he had arthritis in his wrists and that he had been misdiagnosed with carpel tunnel syndrome. Tr. 63, 69. 139.   Contrary to Freeman's assertions, the ALJ specifically accommodated Freeman's wrist arthritis throughout the sequential evaluation process. At step two, the ALJ found Freeman's osteoarthritis and psoriatic arthritis to be severe. Tr. 17.  In the residual functional capacity discussion, the ALJ considered Freeman's testimony that he had continuous pain in his wrists which had worsened over time. Tr. 21.  The ALJ acknowledged that Freeman's right wrist x-ray showed evidence of erosions consistent with his history of psoriatic arthritis.   Tr. 21.

13

Furthermore, when considering the physical residual functional capacity provided by Dr. Potera, the ALJ outlined limitations that were significantly more generous than those recommended by Dr. Potera. Tr. 22. Similarly when considering Dr. Go's medical source statement, the ALJ determined that greater limitations were appropriate and incorporated Freeman's hand/wrist complaints. Tr. 33. The residual functional capacity assessment accommodated limitations in Freeman's upper extremities. The ALJ's analysis is sound and supported by substantial evidence.

## B. ALJ's classification of Freeman's sleep impairments.

Freeman contends that the ALJ erred in holding that his sleep apnea and restless leg syndrome were non-severe impairments at step two of the sequential evaluation process. The determination of whether a claimant has any severe impairment at step two of the sequential evaluation process is a threshold test. 20 C.F.R. §404.1520(c). If a claimant has no impairment or combination of impairments which significantly limit the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. *Id.* If a claimant has any severe impairment, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g).

A failure to find a severe medical condition at step two will not render a decision defective if some other medical condition was found severe at step two. *See, Rutherford v. Barnhart,* 399 F.3d 546, 553 (3d Cir. 2005). However, all of the medically determinable impairments both severe and non-severe must be considered at step two and then at step four when setting the residual functional capacity. The regulations mandate such consideration and this Court has repeatedly so indicated. *See, e.g., Shannon v. Astrue,* 4:11–CV–00289, 2012 WL 1205816, at *10 (M.D.Pa. April 11, 2012) (Rambo, J.); *Bell v. Colvin,* 3:12–CV–00634, 2013 WL 6835408, at *8 (M.D.Pa. Dec.23, 2013) (Nealon, J.); *Stape v. Colvin,* Civil No. 3:13–CV–02308, 2014 WL 1452977, at *6 (M.D.Pa. April 14, 2014) (Brann, J.); 20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

Here the ALJ's failure to find Freeman's sleep apnea and restless leg syndrome severe does not render his decision defective. The ALJ found two of Freeman's other impairments to be severe and proceeded past step two of the evaluation process. There is, however, no evidence that the ALJ considered these sleep impairments when setting the residual functional capacity. The ALJ's only reference to Freeman's sleep apnea and restless leg syndrome is that Freeman's compliance with the CPAP and BiPAP machine was questionable.[4]  Tr. 18.

---

[4]Social Security Rulings mandate that, where an individual has not complied with prescribed treatment, "a determination must also be made as to whether or not failure to follow prescribed

The record demonstrates that Freeman saw Dr. Khaleeq for his sleep apnea and restless leg syndrome. During his visits with Dr. Khaleeq, Freeman was asked to comply with the CPAP and BiPAP machine, and was also told not to engage in activities that require full alertness if he was feeling sleepy, drowsy or otherwise impaired. Tr. 968-69. The ALJ never acknowledged this opinion nor did he articulate a basis for rejecting it. The ALJ must provide "good reasons" for rejecting a treating source's opinion. 20 C.F.R. §404.1527(c); *see also Plummer v. Apfel.* 186 F.3d 422, 427 (3d Cir. 1999)(An ALJ "cannot reject evidence for no reason or for the wrong reason.") (citing *Mason v. Shalala,* 994 F.2d 1058, 1066 (3d Cir. 1993)). The Court finds that the ALJ improperly ignored Dr. Khaleeq's opinion and as a result renders his residual functional capacity assessment improper.

## C. The ALJ's Credibility Determination

Freeman finally challenges the ALJ's credibility determination because the ALJ failed to consider all the pertinent facts, misstated facts and improperly considered certain facts. First, Freeman argues that the ALJ erred by failing to articulate why his impressive work record did not support his credibility. Freeman

---

treatment is justifiable." SSR 82–59. The ALJ must first conclude that medication would be expected "to restore ability to engage in any SGA[.]" *Id.* If the ALJ finds that it would, he or she must then appropriately develop the record to ascertain whether "the claimant . . . is justifiably failing to undergo the treatment prescribed." *Id.* The ALJ failed to develop the record in such a manner.

is correct that the testimony of a claimant with a long, productive work history will be given substantial credibility.  A claimant's work history is, however, one of the many factors the ALJ is to consider in assessing an individual's subjective complaints, 20 C.F.R. §404.1529(c)(3), the ALJ is not required to equate a long work history with credibility.  *See Christil v. Astrue,* 2008 WL 4425817, *12 (W.D. Pa. Sept. 30, 2008).  Furthermore, it is well established that the ALJ need not address every piece of evidence in the record.  *Hurr v. Barnhart,* 94 Fed. Appx. 130, 133 (3d Cir. 2004); *see Johnson v. Comm'r of Soc. Sec.,* 529 F.3d 198, 204 (3d Cir. 2004) (An ALJ may not reject pertinent evidence without explanation, but does not need to cite all evidence the claimant presents).  Therefore, while Freeman's work history was one factor out of many in determining his credibility, the ALJ was under no duty to discuss Freeman's work history.

Freeman next argues that the ALJ erred in discounting his credibility by considering his receipt of UC benefits as being inconsistent with his assertion that he was unable to work as a result of his disability.  Tr. 22.  In support of his position, Freeman relies on a memorandum entitled "Receipt of Unemployment Insurance Benefits by Claimant Applying for Disability Benefits" which states that the "[r]eceipt of unemployment benefits does not preclude the receipt of Social Security Benefits." ECF No. 13-1. Memorandum Dated Nov. 15, 2006 from Frank A.

Cristaudo, Chief Administrative Law Judge. However, the same memorandum also states that "[t]he receipt of unemployment benefits is only one of many factors that must be considered in determining whether the claimant is disabled." (*Id.*). It is therefore entirely proper for the ALJ to consider the receipt of UC benefits as inconsistent with a claim of disability during the same period. *See Meyers v. Barnhart,* 57 F. App'x 990, 991 (3d Cir. 2003); *see e.g., Johnson v. Chater,* 108 F.3d 178, 180 (8th Cir. 1997)(application for unemployment compensation benefits can adversely affect a claimant's credibility because of admission of ability to work requirement for unemployment benefits). Accordingly, the Court finds that the ALJ considered the receipt of UC in a permissible manner, as a non-dispositive factor to assess Freeman's credibility.

Freeman also believes a remand is necessary because the ALJ indicated that the record did not reflect any significant progression in his condition. Tr. 22. Freeman contends that imaging studies could not show any progression because he had end stage disease in his knee joints. Admittedly, imaging studies cannot show progression after a diagnosis of end stage joint disease, however the ALJ's analysis was not limited to this single factor. The ALJ does not refer only to imaging studies, but also to benign physical and musculoskeletal examinations. Tr. 22. The ALJ also supports his statement by pointing to the fact that Freeman's conditions are well

controlled with Methotexate, Ultram and periodic injections for his knee. Tr. 22.  The ALJ's evaluations of Freeman's subjective complaints were reasonably consistent with the objective medical evidence.

Freeman next argues that the ALJ erred by incorporating incorrect facts into his credibility determination.  Specifically, the ALJ reported that Freeman lived alone when the record showed that Freeman lived with his ex-girlfriend and her two children when he applied for benefits, and was still living with his "friend" at the time of his hearing.  Tr. 22, 48, 145.  The ALJ also mistakenly believed that a TKR was never discussed in the medical record and this counted against the severity of Freeman's complaints.  Tr. 22.  The United States Court of Appeals for the Third Circuit has made clear that remand of a case is not required where stricter compliance with the social security ruling or regulations would not have changed the case's outcome.  *Rutherford* 399 F.3d at 553 (refusing to remand where stricter compliance with social security ruling would not have changed the outcome of the case).  "No principle of administrative law 'require[s] that we convert judicial review of agency action into a ping-pong game' in search of the perfect decision."  *Coy v. Astrue,* No. Civ.A.08–1372, 2009 WL 2043491, at *14 (W.D.Pa. July 8, 2009) (quoting *NLRB v. Wyman–Gordon Co.,* 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969)).

In this case, were the Court to remand for a new credibility analysis based on Freeman's living arrangements, the ALJ could simply correct or leave it out entirely and the same outcome would result.  It does not rise above the level of harmless error.  *See Rutherford,* 399 F.3d at 553.  Living with a friend did not affect Freeman's ability to tend to his personal care and to take care of the household chores.  Freeman was able to mow the lawn, prepare meals, shop in stores, manage his finances, watch television, use a computer and write and give sermons for his church.  On the other hand, the same cannot be said for stating that there was no discussion of a TKR when the record reflects the opposite.  The inclusion of this fact could change the outcome of the case and remand is necessary to address it.

Freeman next claims that the ALJ should not have made a finding that Dr. Delvecchio had opined that Freeman was disabled "only to help him gain benefits." Pl. Br. at 11.  The ALJ gave little weight to Dr. Delvecchio's opinion because he concluded that "physicians have both an altruistic and financial interest in aiding their patients." Tr. 23.  Finally, the ALJ concludes that Freeman's status as "disabled" is an issue clearly reserved to the Commissioner.  Tr. 23.  The ALJ must provide "good reasons" to reject treating source opinions.  20 C.F.R 404.1527(c)(2).  Here, the ALJ cited Dr. Delvecchio's "altruistic and financial interest" and this, unfortunately, constitutes rejecting evidence for the wrong reason.  This assertion is pure speculation

and is not supported by any evidence in the record. There is no evidence to suggest that Dr. Delvecchio based his opinion on anything other than his best professional judgment and it was inappropriate for the ALJ to engage in this type of rationalization. *See Shedden v. Astrue.* 4:10-CV-2525, 2012 WL 760632, at *10 (M.D. Pa. Mar. 7, 2012)(Rambo, J.)

Finally, Freeman argues that the ALJ erred by concluding that the only reason why Freeman's last employment was terminated was due mainly to family issues. Tr. 22. The ALJ also noted that Freeman worked in a family run business and was terminated when he divorced his wife. Tr. 22. At trial, Freeman explained that he continued to work for the company for a year after his divorce. Tr. 52-52. Freeman believed that even though he had difficulties with his hands and sleep impairment, he was able to continue working there because of his familial relationship. There is nothing in the record that substantiates the ALJ's assessment that Freeman was terminated mainly due to family issues with his ex-wife and her family. The ALJ's assertion appears to be entirely speculative and this is an impermissible manner in which to evaluate Freeman's credibility.

Generally, an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference. *Coleman v. Comm'r of Soc. Sec.,* 440 F. App'x 252, 253 (3d Cir. 2003) (quoting *Reefer v. Barnhart,* 326 F. 3d 376, 380 (3d Cir.

2003)).  Credibility determinations are the province of the ALJ and should only be disturbed if not supported by substantial evidence.  *Pysher v. Apfel*, No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001)(citing *Van Horn v. Schweiker,* 717 F.2d 871, 973 (3d. Cir. 1983).  In light of the above, the ALJ's credibility findings were not fully explained and supported by substantial evidence.  Consequently, the case must be remanded in order for the ALJ to reassess Freeman's credibility.

## IV. Conclusion

A  review  of  the  administrative  record  reveals  that  the  decision  of  the Commissioner is not supported by substantial evidence.  Pursuant to 42 U.S.C. § 405(g),  the  decision  of  the  Commissioner  vacated  and  remanded  for  further proceedings.  An appropriate Order will be entered.

BY THE COURT:


s/Matthew W. Brann
Matthew W. Brann
United States District Judge

22